OKLAHOMA NATURAL GAS COMPANY, a DIVISION OF ONEOK INC., a Delaware corporation, Plaintiff,

v.

MAHAN & ROWSEY, INC., Reda N. Manes, Doyle E. Manes, Norma Pond Dillard, Imo Longfellow Van Buskirk nee Davies, David H. Loeffler, Ella B. Shaw, Sneed Company, Heirs of Leota Pond Hancock a/k/a Leota Pond Hancox, Bill E. Johns, N.F. Wilder, Heirs of W.A. Martin, Equitable Royalty Corporation, Kenneth H. Goetzke, George D. Goetzke, Ed Kerr, Inc., Visa Exploration Company, Edgar Tenent, Dan Turley, John Reynolds, Clyde Towery, Bess Harrington, O.B. Hayhurst, Clara Turnbull, Mrs. James A. McDonald, Margaret Turnbull, K.L. Turnbull, Wendel H. Turnbull, Mrs. Noel D. Moore, Rainey Oil Company, and Trend Resources, Limited, Defendants.

Bankruptcy No. 82–01390.
Adv. No. 82–0298.

United States District Court,
W.D. Oklahoma.

March 20, 1985.

---

Thomas J. Kirby, Huffman, Arrington, Kihle, Gaberino & Dunn, Tulsa, Okl., Charles Nesbitt, Oklahoma City, Okl., for plaintiff.

Paul Degraffenreid, James W. George & Associates, Gerald E. Durbin, II, Durbin, Larimore & Bialick, Murray Cohen, Paul Kendall Tobin, Cohen Pluess & Tobin, James Kirk, Kirk & Chaney, Oklahoma City, Okl., for defendants.

## MEMORANDUM OPINION

DAVID L. RUSSELL, District Judge.

The Plaintiff Oklahoma Natural Gas (ONG) initiated this action as an adversary proceeding in the Bankruptcy Court of this judicial district against three Defendants, one of whom, the Defendant Mahan & Rowsey, Inc. (MRI), is a debtor in bankruptcy litigation conducted pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101–1174 (1982). ONG subsequently amended its Complaint to add as Defendants numerous parties alleged to be fractional interest holders in the MRI wells that are the subject of this litigation. Rainey Oil and Trend Resources were allowed to intervene as parties Defendant on July 6, 1983. Shortly thereafter, the Bankruptcy Court dismissed two of the original Defendants, Kerr-McGee and Warren Petroleum, thus giving the adversary proceeding the current array of parties set forth above.[1]

In its Complaint, ONG alleged that MRI drilled two natural gas wells, the Manes No. 1 and the Manes No. 3 ("the Manes wells"), into ONG's underground natural gas storage reservoir ("the Depew reservoir") maintained in a depleted formation underlying Creek County.[2] ONG further alleged that MRI was producing natural

---

1. Because of the identity of interests among the numerous parties Defendant, the Court will in the interest of clarity refer to the Defendants collectively as MRI. However, it should be noted that the remaining parties Defendant are working interest owners, royalty interest owners, or overriding royalty interest owners in the Manes wells whose rights are affected by this litigation.

2. In fact MRI drilled three wells in the disputed area. However, the Manes No. 2 well produced a dry hole and is therefore of no interest to this litigation.

gas belonging to ONG from the reservoir and selling it to Kerr-McGee and Warren Petroleum. As a remedy ONG sought three types of relief: (1) damages in the amount of $542,000, representing the gas produced by and sold from the Manes wells; (2) a temporary restraining order and preliminary injunction prohibiting the payment of proceeds of the gas sales to MRI pending the outcome of the litigation; and, (3) a temporary restraining order, preliminary injunction and permanent injunction prohibiting MRI from producing any natural gas from the Manes wells. The pertinent temporary restraining order was initially granted by agreement of the parties, but was subsequently dissolved on September 20, 1982 when the Bankruptcy Court denied ONG's application for a preliminary injunction. As a practical matter, however, ONG received the injunctive relief it desired, as the wells were shut in when Kerr-McGee and Warren Petroleum ceased purchasing natural gas from MRI on October 22, 1982. Further, the amount held by those parties attributable to gas production from the Manes wells was deposited into an escrow account which is now held by the Clerk of the Bankruptcy Court pending the outcome of this proceeding.

The adversary proceeding reached its trial on the merits before the Bankruptcy Court November 21–25, 1983. On November 29, 1983 the Bankruptcy Court entered verbal findings of fact and conclusions of law into the record. On December 7, 1983 an order was issued summarizing these findings and conclusions.[3] The Bankruptcy Court found that ONG had prevailed on its claim against MRI and was therefore entitled to a permanent injunction and disbursement of the funds held in escrow. These findings and conclusions were forwarded to this Court for consideration in accordance with the *District Court Rule on Referral of Bankruptcy Cases*, Misc. Order No. 9 (W.D.Okla. Dec. 22, 1982) of the W.D.Okla.R.P. ("the referral rule").[4]

Almost immediately MRI motioned this Court to disapprove the proposed findings of fact and conclusions of law forwarded by the Bankruptcy Court. ONG responded in opposition to MRI's motion, supporting the findings and conclusions of the Bankruptcy Court. Oral argument was conducted on May 7, 1984 and the Court at that time took under advisement both MRI's motion and the Bankruptcy Court's proposed findings of fact and conclusions of law. A final round of briefing has been completed, and the Court is now prepared to enter its findings of fact and conclusions of law as required by the referral rule. *Cf.* 28 U.S.C. § 157(c)(1)(Supp.1984). For that purpose the Court issues this Memorandum Opinion. *See* Fed.R.Civ.P. 52.

### I.

The first issue that the Court must address concerns the standard of review to be applied to the findings of fact made by the Bankruptcy Court. ONG contends that the Court should apply the "clearly erroneous" standard set forth in Fed.R.Bankr.P. 8013, 11 U.S.C.A. (West 1984), by which the Court would be required to accept the Bankruptcy Court's factual finding unless clearly erroneous. MRI, on the other hand, asserts that the Court should apply the standard of review set forth in the referral rule, § (e)(2)(B), which would permit the Court to give the Bankruptcy Court's findings whatever weight it found appropriate.

---

**3.** The Bankruptcy Court also issued its findings of fact and conclusions of law concerning MRI's counterclaim for abuse of process. This counterclaim was maintained only by the individual Defendant MRI; no other parties Defendant joined. Just before trial on the merits MRI persuaded the Bankruptcy Court to bifurcate the proceedings, reserving trial on the counterclaim until after completion of trial on ONG's claim. However, after finding in favor of ONG on its claim, the Bankruptcy Court proceeded to dispose of MRI's counterclaim as well.

**4.** As the Court will be making its own findings of fact and conclusions of law, *see infra* at 771, those made by the Bankruptcy Court will be neither recounted nor summarized. However, those findings and conclusions were both meticulous and detailed and reflect the careful consideration given to the evidence by the Bankruptcy Court.

MRI contends that the findings deserve no weight and that a *de novo* review is in order in this case.

The review issue in this case is part and parcel of the jurisdictional morass created by the decision of the United States Supreme Court in *Northern Pipeline Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). In *Marathon Pipeline*, the Supreme Court invalidated the "broad grant of jurisdiction to the bankruptcy courts," concluding that the jurisdictional portion of the Bankruptcy Act of 1978, 28 U.S.C. § 1471 (1982), impermissibly vested attributes of an Article III federal court in a legislatively created bankruptcy court not protected by the provisions of Article III. 458 U.S. at 87, 102 S.Ct. at 2880. Thus, many of those matters formerly thought to be within the purview of the Bankruptcy Court are now within this Court's province, most notably those matters involving state created rights and remedies. To alleviate the jurisdictional chaos left in the wake of *Marathon Pipeline*, this Court adopted the referral rule, which permits referral to the Bankruptcy Court of certain matters within this Court's jurisdiction which are nevertheless related to bankruptcy proceedings. However, the referral rule reflects the impact of *Marathon Pipeline*; while such matters may be referred to the Bankruptcy Court, it is incumbent upon this Court to render a final decision on all matters which exceed the jurisdictional limits of the Bankruptcy Court as modified by *Marathon Pipeline*.

It is with this scheme in mind that the Court must determine the proper standard of review to be applied in this case. As the dispute herein involves a state created right and remedy, it is a matter outside the jurisdiction of the Bankruptcy Court. However, as this Court has previously noted, the Bankruptcy Court is empowered to hear such disputes under the

referral rule. *Oklahoma Natural Gas v. Mahan & Rowsey, Inc.*, Adv. No. 82–0298 (W.D.Okla. June 29, 1983). Because the Bankruptcy Court's power to hear the adversary proceeding herein arises solely from the referral rule, it is the Court's opinion that the standard of review prescribed by that rule should be applied in favor of the now questionable bankruptcy rule. Thus, the Court's review of the Bankruptcy Court's proposed findings of fact must be in accordance with the referral rule, which provides in pertinent part:

In conducting review, the district judge may hold a hearing and may receive such evidence as appropriate and may accept, reject, or modify, in whole or in part, the order or judgment of the bankruptcy judge, and need give no deference to the findings of the bankruptcy judge.

*Referral Rule*, Mis. No. 9(e)(2)(B)(W.D.Okla. December 22, 1981). *Cf.* 28 U.S.C. § 157(c)(1)(Supp.1984).

Ordinarily this Court would give great deference to the findings made by the Bankruptcy Court, perhaps such deference as would create a *de facto* "clearly erroneous" standard of review such as that provided by Fed.R.Bankr.P. 8013. The Bankruptcy Court performed an invaluable service in hearing this matter and deliberating on evidence that was both controversial and highly technical, and this Court appreciates the careful consideration and keen understanding exhibited by that court. However, there is some question of the propriety of the Bankruptcy Court's consideration of a learned treatise which had previously been ruled inadmissible. Rather than become involved in the merits of this hotly contested issue, involving constitutional implications, the Court simply chooses to review the record *de novo* and to make its own findings of fact and conclusions of law.[5] To that extent MRI's Motion to the District Court Not to Approve or Endorse Proposed Findings of Fact and

---

**5.** In this regard the Court simply chooses to avoid any possible chance that the Bankruptcy Court's consideration of the treatise was erroneous. Still, the Court must note that, were it

required to address the merits of this proposition, the Court would be inclined to conclude that any error committed was most likely harmless error. *See* Fed.R.Civ.P. 61.

Conclusions of Law By the Bankruptcy Court is granted.

## II.

Much of the factual background of this case is not in dispute. The area in question is the Depew gas field in Creek County, Oklahoma, which began production of native natural gas in the early 1920's but reached the stage of primary depletion by the end of the 1940's. In 1950, ONG obtained permission to use the depleted Dutcher sandstone formation underlying the Depew field for underground storage of extraneous natural gas produced elsewhere by ONG.[6] ONG then began storing natural gas in the formation and has done so to date, using approximate six month cycles of injection during low demand periods and withdrawal during high demand periods.

In the early 1960's the Depew storage began to reflect the loss of substantial quantities of the stored natural gas. In an effort to determine the cause and location of a leak, ONG drilled eight observation wells between 1964 and 1968. It was determined that the gas was escaping to the northeast of the storage area, and ONG drilled a series of water injection wells to inject water into the storage area to block the loss.[7] This procedure was apparently successful, as ONG recorded no further gas loss from the storage area until May of 1982, when full scale production from the Manes wells began.

In 1981 MRI obtained mineral leases and began drilling wells in an area some three miles to the south of the active storage area. Two of the wells, the Manes No. 1 and the Manes No. 3, produced natural gas. A third well, the Manes No. 2, resulted in a dry hole. The producing wells were shut in, however, because MRI lacked a market for the gas. In February of 1982 a market was obtained when MRI concluded gas sales agreements with Kerr-McGee and Warren Petroleum. Production began again in April of 1982, continuing until October of that year, when the buyers ceased purchasing the natural gas. The wells were shut in at that time and remain so to date.

The geographical location of the Manes wells, in relation to the location of the storage area and several of the observation wells, is extremely important in this case. Observation Well No. 1 is at the far northern extremity of the storage area. Directly to the south is the M. Lewis well, an injection and withdrawal well inside the storage area. To the southwest of the Lewis, also within the storage area, is a second injection and withdrawal well, the Big Pond. To the south and slightly to the east of the Lewis, approximately four thousand feet from the active storage area, is Observation Well No. 2. Due south of the Lewis, approximately eight thousand feet from the active storage area, is Observation Well No. 4. Due south of Observation Well No. 4 is Observation Well No. 6, some fifteen thousand feet from the active storage area. The Manes wells are to the west of Observation Well No. 6, almost due south of the active storage area. The close proximity of the Manes wells to Observation Well No. 6 is significant in this case.

Also significant is the positioning of the Dutcher sandstone formation, the underground formation into which ONG pumps its extraneous natural gas. This formation, which is ONG's underground storage reservoir, is found below all of the wells

6. Such permission was obtained by Order No. 67796 of the Oklahoma Corporation Commission. Further, ONG has acquired gas storage agreements authorizing the use of the area for storage from surface owners and mineral interests owners in the area. Indeed, ONG has such agreements with all surface owners and mineral interests owners underlying the Manes No. 3 well, and all surface owners and one third of the mineral interest owners underlying the Manes No. 1 well. There is thus no dispute that ONG is authorized to store gas in the area in which the Manes wells are located; the only dispute is whether those wells are producing ONG storage gas or native natural gas not belonging to ONG.

7. Actually, two of the observation wells, No. 3 and No. 8, were converted into water injection wells in addition to those wells drilled exclusively for the purpose of water injection.

mentioned above; indeed, with but one exception, the parties agree that all those wells are completed in the Dutcher sandstone.[8] An extremely important aspect of the Dutcher is that, as it extends south from Observation Well No. 1, the Dutcher occurs deeper with respect to sea level altitude; at the Manes wells the Dutcher is some one hundred twenty feet lower than the main storage area. The significance of this fact, in light of the positioning of the various wells in the area, will be discussed below.

### III.

ONG's theory of the case requires it to prove three major factual contentions: (1) That the Manes wells are completed in the Dutcher sandstone, the formation in which the Depew storage reservoir is found and in which Observation Well No. 6 is completed; (2) That the Manes wells are in gas communication with Observation Well No. 6; and, (3) That the system of wells comprised of the Manes wells and Observation Well No. 6 is in gas communication with the Depew storage area. Only this last factual issue was hotly contested at trial; however, the Court will consider each factual issue *seriatim.*

### A.

■ MRI does not seriously debate that the Manes wells are completed in the Dutcher sandstone, the same formation in which Observation Well No. 6 is completed. However, the testimony of MRI's geology expert does raise a factual issue in this regard, and for the record the Court finds that the three wells are all completed in the Dutcher sandstone formation.

This issue arises because there exist two sandstone formations underlying the area in question. One is the Dutcher, which has

previously been mentioned. It is undisputed that the storage reservoir lies within the Dutcher, and that all of ONG's wells, including Observation Well No. 6, are completed in this formation. The second is the Morrow, an older formation deposited at an earlier time in history, which is found beneath the Dutcher formation.[9] MRI's geologist testified that the Manes wells are completed in the Morrow formation, and are isolated from ONG's storage reservoir, and therefore Observation Well No. 6, by an impenetrable shale barrier. ONG's experts, however, testified that the Manes wells are completed in the Dutcher formation.

The Court finds more believable the testimony of ONG's geology experts. The first expert, a consulting geologist, testified that the Dutcher is continuous from the storage area to the Manes wells, and that the Manes wells are completed in that formation. He also testified that, while there is some evidence that the Morrow exists below Observation Well No. 6, that well is not deep enough to be completed in the Morrow. He further testified that the Morrow does not exist below the Manes wells.

ONG's second witness, a paleontologist and biostratigrapher, offered testimony that is consistent with and supportive of the geologist's testimony. He opined, as did the geologist, that there is no Morrow formation beneath the Manes wells.

MRI's geology expert, on the other hand, testified that the Morrow does indeed exist below the Manes wells, and that those wells are completed in the Morrow. The Court finds this expert's testimony unpersuasive for two reasons. First, his charts were demonstrated to be flawed at trial, casting some doubt on the validity of those exhibits prepared by him and relied on in his testimony. Second, his testimony in many respects conflicted with that of

8. MRI's geology expert testified that the Manes wells are completed in a formation underlying the Dutcher. However, as will be noted, the formation into which the Manes wells are completed is relatively insignificant to the outcome of this litigation and was not seriously contested at trial.

9. MRI's experts referred to the Dutcher as the Atoka sandstone and the Morrow as the Pennsylvania unconformity sandstone. In the interest of clarity the Court chooses to use the terminology used by ONG's experts: The Dutcher and the Morrow.

MRI's other experts. For example, as noted above, he testified that an impenetrable shale barrier isolates the Morrow from the Dutcher; however, it was overwhelmingly demonstrated by ONG, and acknowledged by MRI's engineering experts, that the Manes wells were in some form of communication with Observation Well No. 6. This of course negates the idea that an impenetrable barrier exists, as those wells could not communicate at all unless the structures between the Dutcher and the Morrow are at least permeable to water.[10]

While the testimony of MRI's geologist was helpful and instructive for the Court, it is simply not as believable as that provided by ONG's experts on this issue. Accordingly, the Court finds that the Manes wells are completed in the Dutcher sandstone formation, the same formation in which Observation Well No. 6 and the Depew storage reservoir are found.

### B.

■ Another factual issue not causing serious controversy is whether the Manes wells are in gas communication with Observation Well No. 6. MRI admits the existence of pressure communication between the wells, as indeed it must in light of the overwhelming evidence of the pressure relationship between the wells. While pressure communication does not necessarily enable natural gas to migrate from one well to another, MRI does not seriously dispute the existence of gas communication, either. Indeed, it is MRI's theory that the Manes wells and Observation Well No. 6 are in a separate reservoir of native natural gas and not in the Depew Storage reservoir, and gas communication between those wells is therefore not only possible but also likely.[11] MRI's engineering experts offered no opinion concerning the existence of gas communication between

these wells, but seemed willing enough to admit that it does occur. The same can be said for the Bankruptcy Court's independent expert. Thus, the Court concludes that the Manes wells and Observation Well No. 6 are in gas communication.

There is ample evidence to support such a finding. First, there is a striking pressure relationship between the wells. Second, as noted above, the wells are in close proximity, completed in the same formation, and are nearly equal in depth. Third, studies of gas samples from the Manes and from Observation Well No. 6 indicate that the wells produce strikingly similar, if not identical, gas. Given this persuasive evidence, and the absence of evidence to the contrary, the Court finds that there is gas communication between the Manes wells and Observation Well No. 6.

### C.

The final factual issue, whether the Manes-Observation Well No. 6 system is in gas communication with the Depew storage reservoir, is the most hotly contested question of the litigation. ONG contends, and bears the burden of proving, that the gas in its storage reservoir migrates through the Dutcher formation to the Manes wells; thus, ONG asserts that MRI is producing ONG's extraneous natural gas injected into the Dutcher for storage purposes. MRI, on the other hand, asserts that the storage reservoir is separated from the system of wells comprised of the Manes wells and Observation Well No. 6 by a continuous body of water, which blocks the migration of natural gas from the storage area. Thus, while MRI admits the existence of pressure communication between the storage area and the Manes area, it vehemently denies that gas is communicated from the storage area to the Manes area.

---

**10.** The speculation that such communication might occur notwithstanding the impenetrable barrier through a fault or leaky well strikes the Court as somewhat contrived; in any event, it is mere speculation.

**11.** This theory explains why the formation issue mentioned above is relatively unimportant to MRI's case. It is MRI's contention that, regardless which formation the Manes wells are in, those wells produce from a native natural gas reservoir which includes Observation Well No. 6, not from the Depew Storage reservoir.

MRI's opposition to ONG's theory of gas communication is well based. Noting that the Dutcher moves downward with respect to sea level from north to south, MRI contends that the existence of a water table in the storage reservoir prevents the existence of a continuous gas channel between the storage area and the Manes area. MRI believes this to be the case because water, being heavier than gas, would displace any gas in the Dutcher outside the storage area, forcing that gas into the structurally higher storage area rather than into the structurally lower channel of the Dutcher between the storage area and the Manes. More simply put, MRI contends that because water seeks its own level there can be no gas in the Dutcher outside the storage area, as the storage area is a structural high in the region in which a water table exists. Thus, concludes MRI, the gas in the storage area and the gas found in the Manes wells and Observation Well No. 6 are separated by a solid column of water, causing the wells to exhibit a pressure relationship but not allowing communication of natural gas. MRI believes that the gas found in the Manes area is native natural gas occurring in the Dutcher naturally rather than by injection by ONG and migration down structure through the Dutcher.

MRI's theory is well chosen in that it depicts the natural conditions of the Dutcher sandstone at equilibrium; that is, in the undisturbed state of nature MRI's theory would no doubt be valid. However, ONG's case focuses on the assertion that the Dutcher is not in equilibrium, after over thirty years of injection and withdrawal of natural gas and injection of water. Indeed, MRI's experts confirm that the area is not in equilibrium. ONG contends that in this disturbed state a tilted water table, which would permit gas communication down structure, has occurred in the Dutcher.

The concept of a tilted water table is difficult to grasp because it is rare in nature; however, it is apparently a physical possibility notwithstanding its rarity. In essence, ONG contends that, rather than a flat water table in the Dutcher, the water table slopes downward to the south, leaving an unfilled portion of the formation through which natural gas can migrate from the storage area to the Manes wells.

ONG presents a strong evidentiary basis in support of this theory. Its engineering expert testified that the cyclical pressure changes, occasioned by the injection and withdrawal cycle, would cause natural gas in the storage area to finger out from the storage area and down the Dutcher, displacing water as it moves. This occurrence is known as gravity override, as gravity is defied when the lighter gas moves downward to displace the heavier water.

While gravity override is apparently a very unusual natural phenomenon, ONG's engineering witness opined that such a phenomenon had occurred in the Dutcher formation. This opinion spawned immediate and heated controversy; MRI's engineering experts, one of whom is apparently an expert on gravity override, vehemently denied that gravity override could occur in a system such as the Dutcher formation due to lack of volume of moving gas and a low rate of flow. MRI contends that, absent gravity override, there can be no tilted water table and therefore no gas communication.

Whether or not the existence of a tilted water table in the Dutcher may be properly attributed to the phenomenon of gravity override, the evidence presented at trial does support that the Dutcher's water table exhibits a downward tilt toward the south. Observation Well No. 1, at the extreme north edge of the storage area, has a gas-water contact point 2458 feet below sea level. Farther south, Observation Well No. 2 has a gas-water contact point at 2472 feet below sea level. Observation Well No. 4, still farther south, has its gas-water contact point at 2540 feet below sea level. And Observation Well No. 6, the well farthest south of all and in close proximity to the Manes wells, has a gas-water contact point at 2584 feet below sea level. Thus, it is clear that the water table in the Dutcher has not reached its own level, and that the

**776**

Dutcher is not water saturated continuously between the storage area and the system of wells comprised of the Manes and Observation Well No. 6. ONG argues that this reflects a continuous layer of natural gas above the connate water in the Dutcher, connecting the storage area and Observation Well No. 6 and, through this connection, the Manes wells.

The existence of gas in the Observation Wells between the storage area and the Manes wells tends to negate MRI's assertion that the Dutcher is completely water saturated between those points and therefore cannot convey gas from the storage area to the Manes wells. MRI does, however, offer an explanation of the presence of gas in those wells which is not inconsistent with its noncommunication theory. Specifically, MRI's experts testified that each of the observation wells might be drilled into a gas trap, a structural anomaly underground in which natural gas is trapped in such a way that it cannot be displaced up the structure by heavier water. Thus, while the normal pattern would be for the gas to move up structure, and the water down structure, the existence of a trap causes an isolated miniature reservoir around each of the observation wells.

■ This explanation, although supported by the opinion testimony of MRI's experts, is much less believable than ONG's theory of a tilted water table and strikes the Court as rather contrived. Indeed, it strains credulity to dismiss as mere happenstance the fact every one of the observation wells was drilled into a gas trap; surely one of those wells should have encountered a portion of the Dutcher not characterized by a rare structural anomaly. Thus, the Court declines to adopt such an unlikely theory; rather, the Court concludes that the Dutcher is characterized by a tilted water table, over which gas from

the storage area may pass to Observation Well No. 6 and to the Manes wells.[12] Accordingly, the Court finds that the system of wells comprised of the Manes wells and Observation Well No. 6 is in gas communication with the storage area.

**D.**

■ As there is gas communication between the storage area and the Manes wells, it follows that the gas produced by the Manes wells is ONG's extraneous storage gas and not, as MRI contends, native natural gas. There is ample evidence to support such a conclusion. ONG's engineering expert testified to his opinion that the gas produced by the Manes wells is not native natural gas because: (1) helium is found in the gas in appreciable quantities, and helium occurs only rarely, if at all, in Creek County gas fields; (2) certain organic compounds normally found in native natural gas are absent from the gas produced by the Manes wells, indicating that the gas has been previously produced and processed; (3) the gas produced by the Manes wells is dissimilar in composition from native natural gas produced by other wells in the area; and, (4) the bottom hole pressures encountered in the Manes wells do not exhibit the characteristics expected from a native natural gas reservoir. While each of these factors was disputed at trial, the Court finds credible the testimony of ONG's experts in this respect. Thus, the Court finds that the Manes wells are producing extraneous natural gas belonging to ONG and injected for storage into the Depew storage reservoir, rather than native natural gas from an isolated reservoir in the Dutcher.

**E.**

A final word is in order concerning the quality of the expert testimony presented

12. The Court declines to usurp the role of the petroleum engineer by determining the engineering principle which explains the existence of the tilted water table. Rather, the Court simply concludes that it exists, a conclusion well supported by evidence, as noted above. Whether it occurred through gravity override

or, for example, because of variable permeability in the Dutcher sandstone, is beyond the expertise of the Court to determine; however, the fact of the tilted water table's existence is well within this Court's expertise given the evidence presented at trial.

at trial by the parties. The Bankruptcy Court heard evidence from an impressive array of experts, all of whom boasted impeccable credentials in the areas of education and experience. The quality of the expert testimony was consistently excellent and provided invaluable assistance and enlightenment to the Bankruptcy Court and to this Court on review.

The excellence of the expert testimony does not ease the difficulty of the Court's fact finding process. The Court is required to weigh sharply conflicting testimony concerning matters well outside its area of expertise. Conditions several thousand feet below the surface are not capable of absolute and unflawed discernment; as this litigation profoundly demonstrates, even the experts disagree as to what is occurring underground. The Court is not a font of wisdom with the oracular ability to divine that which cannot be shown in concrete terms; rather, the Court is required to consider the evidence and determine that which has been proven by a preponderance of the evidence under the rules of law. Thus, in the final analysis, the outcome of this case turns on the credibility of the witnesses, and because the Court finds the testimony of ONG's witnesses, taken as a whole, to be more believable than that of MRI's witnesses, the Court concludes that ONG has sustained its burden of proof.

### IV.

ONG is a natural gas utility which is charged with providing natural gas to a large number of customers. To facilitate this function, ONG maintains the Depew storage reservoir, which prevents natural gas shortage in months of high demand. As the Manes wells are producing ONG's natural gas from the Depew storage, ONG suffers irreparable harm to its ability to provide service to its customers, harm for which there is no adequate remedy at law. ONG is therefore entitled to a permanent injunction prohibiting MRI from producing any more natural gas from the Manes wells. Likewise, ONG is entitled to receive all amounts currently held by the Clerk of the Bankruptcy Court, as those amounts are the proceeds of ONG's natural gas produced and sold by MRI.

Accordingly, an appropriate form of judgment, with a permanent injunction, shall be issued by this Court in accordance with this Memorandum Opinion.

### V.

The last issue to be addressed is MRI's counterclaim for abuse of process. This counterclaim was not tried during the adversary proceedings; thus, neither party is entitled to judgment thereon. However, the Court is persuaded that ONG is entitled to have the counterclaim dismissed. As the Bankruptcy Court noted, ONG has committed no abuse of process simply by pursuing this litigation to a judgment in its favor, a judgment to which it is entitled. Given the outcome of the adversary proceeding, the Court can discern no unlawful purpose in ONG's maintenance of this action. Use of process for an unlawful purpose is essential to an abuse of process claim. 1 Am.Jur.2d *Abuse of Process* § 4 (1962). *See also Blue Goose Growers, Inc. v. Yuma Groves, Inc.,* 641 F.2d 695, 696–7 (9th Cir.1981). As MRI's counterclaim is premised on ONG's alleged use of this litigation for unlawful means, it is clear that there is no set of facts imaginable which would entitle MRI to the relief it seeks. Accordingly, MRI's counterclaim for abuse of process is dismissed. *See* Fed.R.Civ.P. 12(b)(6).

### VI.

In summary, the Court reaches the following conclusions in this action:

1. MRI's Motion to the District Court Not to Approve or Endorse Proposed Findings of Fact and Conclusions of Law By the Bankruptcy Court is granted;

2. ONG has prevailed on its claim for relief and judgment shall be entered accordingly, as noted above; and,

3. MRI's counterclaim for abuse of process is dismissed for failure to state a claim upon which relief can be granted.